**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>KAMALUDEEN ADEBOYE GIWA, )<br>)<br>Defendant. )<br>_____ ) | 2:05-cr-0132-RLH-LRL<br>Motion to Suppress (#168) |

# REPORT & RECOMMENDATION

The defendant, Kamaludeen Adeboye Giwa, is awaiting trial on a fifteen count Indictment charging him with Conspiracy to Make False Official Statements, and to Commit Identity Theft, Aggravated Identity Theft, Access Device Fraud and Mail Fraud, in violation of 18 U.S.C. § 371 (Count 1); False Official Statements, in violation of 18 U.S.C. § 1001 (Counts 2-6); Mail Fraud, in violation of 18 U.S.C. § 1341 (Counts 7-11); Identity Theft, in violation of 18 U.S.C. § 1028(a)(7) (Count 12); Access Device Fraud, in violation of 18 U.S.C. § 1029(a)(2) (Counts 13 and 14); and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1)(Count 15). The matter before the court is Mr. Giwa's Motion to Suppress Evidence (#168), in which he contends that a series of unlawful entries by federal authorities into his Los Angeles apartment on October 8, 9 and 10, 2004 resulted in the seizure of incriminating evidence which must be suppressed as the fruits of the prior illegalities. The government filed an Opposition (#191), Mr. Giwa filed a Reply (#210) and the government filed a Supplemental Memorandum (#219).

An evidentiary hearing was conducted on August 3, 2006. At the evidentiary hearing

U.S. Postal Inspector Vicki Dee Lenard testified for the government. Kim Noriega, Mr. Giwa's part-time housekeeper, testified on behalf of Mr. Giwa, as did Mr. Giwa himself. Thereafter Mr. Giwa filed a Supplemental Memorandum and Exhibits (#251) and a Second Supplemental Memorandum (#260), to which the government filed a Response in Opposition (#268). Closing arguments were presented on January 16, 2007. The court has considered the motion, opposition, reply, supplements, response, and the testimony and exhibits offered at the evidentiary hearing.

**THE EVIDENCE**

Based on the testimony adduced and exhibits received at the evidentiary hearing, and the exhibits attached to the parties' papers, the court finds that the following facts have been established by a preponderance of the evidence. In September, 2002, following a conviction for mail fraud in the District of Nevada, Mr. Giwa was sentenced to a term of imprisonment followed by three years of supervised release. His supervision began in May, 2003. On June 10, 2004, the U.S. Probation Office in Las Vegas filed a petition for revocation of his supervised release on the ground that he was again involved in criminal activity.[1] On the basis of that petition, then U.S. District Judge David Hagen on June 21, 2004 ordered that a warrant be issued for Mr. Giwa's arrest. On June 22, 2004, the arrest warrant was issued by the Clerk's Office and signed by a deputy clerk.

On October 8, 2004, the U.S. Marshals Service advised Postal Inspector Vicki Lenard (then Morgan) that it had learned that Mr. Giwa was living in an apartment located at 600 South Curson Avenue in Los Angeles, California. Inspector Lenard learned from the apartment manager that Mr. Giwa had recently rented Apartment 309 under the name William Slumka, that he drove a silver Range Rover, and that his assigned parking spaces were 134 and 135.

---

[1] The alleged criminal activity consisted, in large part, of the identity theft activities alleged in the instant Indictment.

Inspector Lenard determined that the social security number that Mr. Giwa provided when he rented the apartment belonged to a William Slumka who lived in Saginaw, Michigan.

During its investigation into Mr. Giwa's whereabouts the Marshals Service reviewed a Postal Inspection Service Personal History Data Sheet on Mr. Giwa, which noted that Mr. Giwa had made threats to kill Postal Inspectors. It also noted that on one occasion he had tried to flee from officers of the Beverly Hills Police Department. Inspector Lenard informed the Marshals Service that on two additional occasions in 2004 Mr. Giwa escaped from or evaded law enforcement on foot, one time by running across a highway and into a woodline. One of the Deputy U.S. Marshals involved in hunting for Mr. Giwa had been a member of an arrest team that had captured Mr. Giwa in 1999 on the earlier federal charges. A confidential informant had warned the deputy marshals who were looking for Mr. Giwa at that time that Mr. Giwa may have weapons that he would use against them and would likely attempt to flee. When the deputy marshals went to Mr. Giwa's residence in 1999, he did not come to the door for three minutes while an accomplice was flushing evidence down a toilet.

Although cell site monitoring of Mr. Giwa's cell phone indicated the phone was in Las Vegas on October 8, 2004, an arrest team of deputy marshals went to Mr. Giwa's apartment and saw light flickering in the window, and at the door heard muffled voices coming from within. Suspecting that Mr. Giwa was present, and being concerned that he posed a risk of violence and flight, the deputy marshals let themselves into the apartment with a pass key without first knocking or announcing their identity. Once inside, they announced their presence, but received no response. A sweep of the apartment revealed that no one was home. The flickering light and muffled voices were emanating from a television set that had been left on with the volume up. The marshals departed from the premises without searching or seizing anything.

On the next afternoon, October 9, 2004, cell site monitoring indicated that Mr. Giwa's cell phone was back in Los Angeles. Several postal inspectors and deputy marshals jointly put Mr. Giwa's apartment under surveillance. At approximately 6:00 p.m., they noted that a black

1  Mercedes Benz registered under one of Mr. Giwa's known aliases was in one of his assigned
2  parking spaces, but that the silver Range Rover was gone. Moreover, cell site monitoring
3  indicated that Mr. Giwa's cell phone was not in proximity to the apartment. At about 9:00 p.m.,
4  the marshals and inspectors left the apartment complex to get something to eat. Shortly before
5  10:00 p.m. they received a call from the deputy marshal who was monitoring the cell site
6  activity of Mr. Giwa's cell phone. The deputy reported that it now appeared that Mr. Giwa had
7  returned to the apartment. The marshals and inspectors returned immediately.

8  Again concerned for their safety and the risk of attempted flight or evidence destruction,
9  the marshals and inspectors entered Apartment 309 without knocking or announcing. After they
10 gained entry they identified themselves and announced that they had a warrant for Mr. Giwa's
11 arrest. They took Mr. Giwa into custody without incident. Also in the apartment was Ms. Ndidi
12 Nwokekeh, a friend of Mr. Giwa who had flown in from Baltimore that day to visit Mr. Giwa.
13 Inspector Lenard secured Ms. Nwokekeh next to the living/family room couch where she was
14 standing when the marshals and inspectors gained entry. Other marshals conducted a protective
15 sweep of the entire apartment and found no other persons present. During the sweep no boxes
16 or other containers were opened or searched.

17 On the living/family room floor in plain view next to the couch and a sliding glass door
18 were several partially opened boxes and stacks of papers and documents. Sitting atop one of
19 the stacks of papers in plain view was a credit report in the name of Peter Dunbar, apparently
20 an anesthesiologist at the University of Washington. *See* Government Exhibits 1-4
21 (photographs depicting the living or family room, couch, boxes and stacks of papers, and the
22 credit report, taken prior to the search that would be conducted the next day).[2] On the kitchen
23 counter in plain view were two Mont Blanc watches. Neither Inspector Lenard nor the other

---

25 [2] Five days earlier a confidential informant had told Inspector Lenard that on September 2, 2004, he
   and Mr. Giwa went in Mr. Giwa's silver Range Rover to a business that provided internet access, where the
26 informant downloaded for Giwa numerous credit reports onto three diskettes.

inspectors or deputy marshals touched or moved anything other than Mr. Giwa himself and Ms. Nwokekeh. Mr. Giwa was taken immediately to the Metropolitan Detention Center in Los Angeles. Inspector Lenard interviewed Ms. Nwokekeh for about half an hour before leaving the premises. The apartment was locked and guarded all night by postal inspectors positioned outside the door while Inspector Lenard sought the search warrants in question.

On the strength of Inspector Lenard's affidavits, U.S. Magistrate Judge Jeffrey Johnson in the Central District of California issued search warrants on October 10, 2004 for Mr. Giwa's apartment and silver Range Rover. On October 12, 2004, U.S. Magistrate Judge Paul Game, Jr. issued a search warrant for Mr. Giwa's black Mercedes Benz. *See* Exhibit 3 to Government's Opposition to Giwa's Motion to Suppress Evidence (#191). The affidavits in support of the search warrants for Apartment 309 and the silver Range Rover are virtually the same. Each affidavit contains eighteen (18) paragraphs. All but one of the paragraphs contains information developed by Inspector Lenard during the course of her investigation prior to October 9, 2004. Only paragraph 17 contains information acquired as a result of the entry into Apartment 309 on October 9, 2004, the day Mr. Giwa was arrested. That paragraph reads as follows:

> On October 9, 2004, GIWA was arrested at the SUBJECT PREMISES by the U.S. Marshals and U.S. Postal Inspectors, including myself. During a safety sweep of the SUBJECT PREMISES, I observed stacks of paperwork in the family room near the balcony. In plain view, on top of one of the stacks, I saw what I recognized to be a credit report. In addition, I observed two Mont Blanc watches on the counter of the kitchen in plain view. (As discussed above, GIWA was identified in a photo spread at a Mont Blanc store.) A female who identified herself as Ndidi Nwokekeh was with GIWA at the SUBJECT PREMISES at the time of his arrest. Ms. Nwokekeh informed me that she had flown in earlier that day, GIWA had picked her up at the airport in the silver Range Rover (SUBJECT VEHICLE), and they went to the Beverly Center where GIWA purchased a pair of shoes for her. I asked her if she could produce the receipt for the purchase and she related to me that it was still in GIWA's Range Rover.

On October 10, 2004, Inspector Lenard and other postal inspectors searched Mr. Giwa's apartment and Range Rover and found numerous incriminating items of evidence.

. . .

5

**DISCUSSION**

*1. Validity of Arrest Warrant*

Mr. Giwa contends that the arrest warrant issued on June 22, 2004, which was based on the petition for revocation of supervised release, was invalid. Noting that Fed.R.Crim.P. 4(b)(1)(D) requires that an arrest warrant be signed by a judge, Mr. Giwa contends that the warrant was "deficient on its face" because it was signed by a court clerk, not by a judge. Mr. Giwa's reliance on Rule 4 is misplaced.

Rule 4 does not prescribe the requirements for all arrest warrants; by its express terms it addresses the issuance, form and execution of an arrest warrant that is based only on a criminal complaint. In contradistinction, Rule 9, which addresses the issuance, form and execution of an arrest warrant on an indictment or information, requires that the warrant "be signed by the clerk ...." Rule 9(b)(1). The Rules are silent with respect to the issuance, form and execution of an arrest warrant on a petition for revocation of probation or supervised release. Rule 32.1, which addresses revocation of probation or supervised release, addresses only those procedural requirements that come into play once a defendant is arrested or summoned before the court for violating probation or supervised release.

Here, consistent with the long-standing practice in this district, the revocation petition prayed that the court "order a warrant to initiate" revocation proceedings. *See* Exhibit 1 to Government's Opposition to Motion to Suppress (#191). On June 21, 2004, Judge Hagen signed an order that a warrant be issued. In compliance with the order, a deputy clerk issued and signed the warrant the next day. This procedure corresponds to the procedure prescribed by Rule 9 for the issuance and form of a warrant on an indictment or information. The court therefore rejects Mr. Giwa's contention that failure of a judge to sign the warrant rendered it invalid.

Citing *United States v. Vargas-Amaya*, 389 F.3d 901 (9th Cir. 2004), Mr. Giwa contends that the warrant was invalid for the additional reason that the probation officer who presented

1  the petition on which the warrant was based did not do so on oath or affirmation.  In a case of
2  first impression, the court in *Vargas-Amaya* held that "a district court's jurisdiction to revoke
3  supervised release can be extended beyond the term of supervision under [18 U.S.C.] § 3583(I),
4  based upon a warrant issued during the term of supervision, only if the warrant was issued 'upon
5  probable cause, supported by Oath or affirmation,' as required by the Fourth Amendment." *Id.*
6  at 907.  Prior to the decision in *Vargas-Amaya* probation officers in this district had for many
7  years submitted revocation petitions and requests for warrants under § 3583(I) on unsworn facts.
8  Indeed, the court commented that "no case of which we are aware has addressed whether the
9  'warrant' provided for in § 3583(I) must be supported by sworn facts." *Id.* at 903.  In reaching
10 its conclusion the court observed that the plain meaning of the term "warrant" implies that it is
11 based on probable cause and supported by sworn facts.  The court held for the first time that a
12 supervised release revocation warrant based on unsworn facts would not invest the court with
13 jurisdiction to revoke supervised release beyond the term of supervision.  *Vargas-Amaya* was
14 decided on November 22, 2004.  As noted, the petition at issue here was filed five and a half
15 months earlier, on June 10, 2004.  When Judge Hagen ordered that a warrant be issued on June
16 21, 2004, no circuit opinion required a probation officer to swear to the facts set out in a
17 revocation petition.  The probation officer in this case was following established procedure
18 under § 3583(I).  No case of which this court is aware has held that *Vargas-Amaya* should be
19 applied retroactively.  The court therefore rejects Mr. Giwa's contention that the warrant on
20 which he was arrested on October 9, 2004 was without legal effect.
21 *2. Legality of Entry on October 8, 2004*

22         In his Motion to Suppress Evidence (#168), Mr. Giwa alleges that federal law
23 enforcement officers made a warrantless surreptitious entry into his apartment on October 8,
24 2004.  The entry was not warrantless.  The deputy marshals acted on the authority of the arrest
25 warrant issued by Judge Hagen in June, 2004.  "[F]or Fourth Amendment purposes, an arrest
26 warrant founded on probable cause implicitly carries with it the limited authority to enter a

7

1  dwelling in which the suspect lives when there is reason to believe the suspect is within."
2  *Payton v. New York*, 455 U.S. 573, 602-03 (1980). In the Ninth Circuit "the 'reason to believe'
3  standard of *Payton* ... embodies the same standard of reasonableness inherent in probable
4  cause." *United States v. Gorman*, 314 F.3d 1105, 1112 (9th Cir. 2002). The question, then, is
5  whether the deputy marshals had probable cause to believe Mr. Giwa was in the apartment at
6  the time they entered. On the one hand cell site monitoring reflected that Mr. Giwa's cell phone
7  was in Las Vegas. On the other hand, at Mr. Giwa's apartment the marshals saw lights
8  flickering in the living room window, and at the front door they heard the sound of voices
9  coming from within. Whether they had probable cause to believe Mr. Giwa was in the
10 apartment is a close call. The court need not resolve the issue, however, because the record is
11 clear that the October 8 entry into the apartment involved no search for and no seizure of any
12 evidence or receipt of any information that in any way advanced the postal inspectors'
13 investigation.

*3. Legality of Entry on October 9, 2004*

Mr. Giwa alleges that on October 9, 2004 the surveillance agents saw him return to his apartment in his silver Range Rover at approximately 10:00 p.m. Without citing any authority, he argues that the agents' decision to allow him to enter his residence before executing the arrest warrant, instead of arresting him then and there in the parking lot, "was clearly a ruse and a pretext designed to unconstitutionally avoid having to obtain a search warrant for the apartment." Motion (#168) at 8. The court need not reach this issue, because Mr. Giwa's factual predicate is false. The evidence is uncontroverted that no surveillance agents were present when Mr. Giwa returned home. The marshals and postal inspectors were in a restaurant when they were notified by the cell site monitoring agent that Mr. Giwa's phone was in close proximity to the apartment building.

Mr. Giwa further argues that the decision of the arresting agents not to knock and announce their identity and purpose before gaining entry into the apartment was not justified

by either exigent circumstances or the information about Mr. Giwa's alleged threat of violence or evidence destruction. Without conceding that there was a knock-and-announce violation, the government notes that in *Hudson v. Michigan*, 126 S.Ct. 2159 (2006), the Supreme Court recently held that the exclusionary rule is not the appropriate remedy for a violation of the knock-and-announce rule. The Court noted that whereas the exclusion of evidence obtained by a warrantless search vindicates a citizen's right of privacy in his home, "[t]he interests protected by the knock-and-announce requirement are quite different—and do not include the shielding of potential evidence from the government's eyes." *Id.* at 2165. The interests protected by the knock-and-announce rule are "the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident[;]" "the protection of property," that is, the rule gives the resident "the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry[;]" and "those elements of privacy and dignity that can be destroyed by a sudden entrance." *Id*. (citations omitted).

> What the knock-and-announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant. Since the interests that *were* violated in this case have nothing to do with the seizure of the evidence, the exclusionary rule is inapplicable.

*Id*. (emphasis in original).

Following the entry on October 9, 2004, no search took place. Immediately upon entry the marshals conducted a protective sweep to ensure that no one other than Mr. Giwa and Ms. Nwokekeh were present. Except for Mr. Giwa himself, who was arrested on the warrant, nothing was seized or disturbed by the postal inspectors or deputy marshals. Inspector Lenard noticed the boxes and documents in plain view on the floor in the living/family room, and inspected a credit report in plain view on top of a stack of papers without disturbing it. The premises were secured until a search warrant could be obtained the next day. The government agents' observations and conduct would have been the same whether or not they had knocked

and announced before entering.  In short, even if the court were to assume without deciding that the agents violated the knock-and-announce rule, *Hudson* renders the exclusionary rule inapplicable.

*4. Validity of Search Warrants Issued and Executed on October 10, 2004*

Mr. Giwa contends that paragraph 17 of Inspector Lenard's affidavit in support of the search warrants for his apartment and silver Range Rover contains deliberately false or misleading statements about what she saw in the apartment when Mr. Giwa was arrested, such that without those statements the affidavit would lack the probable cause necessary to justify the issuance of the search warrants. *Franks v. Delaware*, 438 U.S. 154 (1978). The statements at issue are the following:

> During a safety sweep of the SUBJECT PREMISES, I observed stacks of paperwork in the family room near the balcony.  In plain view, on top of one of the stacks, I saw what I recognized to be a credit report.

*See* Exhibit 3 to Government's Opposition to Giwa's Motion to Suppress Evidence (#191).  The obvious implication of the two statements is that the stacks of paperwork were in the family room near the balcony in plain view before the postal inspectors entered the apartment. Indeed, that was Inspector Lenard's testimony at the evidentiary hearing.  Mr. Giwa appears to take the position that what really happened on October 9, 2004 was that following his arrest and removal from the premises the inspectors conducted an unlawful warrantless search, opened a cabinet, found the boxes of paperwork hidden in the cabinet, and arranged the materials to make it appear that they had been in plain view when the federal agents entered the apartment.  In support of that position at the evidentiary hearing Mr. Giwa offered his own testimony and that of his part-time housekeeper, Kim Noriega.

Ms. Noriega testified on direct examination that the last time she cleaned Mr. Giwa's apartment was in October of 2004.  She recalled that she left it very clean and neat, and saw no credit reports or other paperwork or credit cards.  She believed it was on a Friday or Saturday because among her duties was an occasional trip to the supermarket to shop for Mr. Giwa,

10

which she did the last time she cleaned for him. She recalled that the supermarket was extremely crowded that day, which meant that it must have been on a Saturday.[3] On cross-examination, however, Ms. Noriega admitted that shortly before she took the witness stand she told Inspector Lenard that her last cleaning of Mr. Giwa's apartment could have been on a Tuesday or a Thursday. She also admitted that she'd seen boxes stacked up in the living room, and that they could have been stacked up on the Saturday on which she last cleaned. She testified that she left Mr. Giwa's apartment for the day at about 3:30 or 3:45 p.m., and had no idea what the condition of the apartment was at 10:00 o'clock that night.

Mr. Giwa testified that Ms. Noriega cleaned his apartment on October 9, 2004. He said he left the apartment at approximately 8:30 a.m., and didn't return until about 10:00 p.m. with Ms. Nwokekeh after he picked her up at the airport. In response to his attorney's question whether there were credit reports and other documents in plain view anywhere in the apartment when he returned at 10:00 p.m., Mr. Giwa testified:

> A   For the record, I want to make it clear. Nendide [Nwokekeh], she doesn't know what I do. I told her I was a soccer player. So she doesn't know I do fraud.
>
> * * *
>
> Because she's going to be in my apartment for three days, so there's no way I want her to see anything I do. Believe me.

Transcript: 96: 9-11; 97: 3-4.

On cross-examination the following exchange occurred:

> Q   Did you have more than one box stacked in your apartment near the balcony?
>
> A   Okay. I'm going to make it clear for the Court. A day before, a day, on Friday, there was boxes right in the living room by the couch. But the day on the 9th when I got arrested, there was - - I took all the boxes and I hide it.

---

[3] October 9, 2004 fell on a Saturday.

11

Transcript: 108:21-109:1.

The court finds the testimony of Ms. Noriega unreliable, and the testimony of Mr. Giwa implausible. With her testimony Ms. Noriega was obviously trying to help Mr. Giwa, but was unable to satisfactorily pin down the date or the day of the week on which she last cleaned his apartment. Testifying almost two years after the events in question, she decided that she cleaned his apartment on a Saturday because she happened to recall that the supermarket where she shopped for Mr. Giwa that day was "extremely crowded." She also acknowledged that it could have been on a Tuesday, Thursday or Friday. Because her testimony is so unreliable, Ms. Noriega's effort to support Mr. Giwa's story is weightless.

Mr. Giwa admits that on Friday, October 8, 2004, "there was boxes in the living room right by the couch." He testified that before Ms. Noriega arrived on Saturday morning he hid them in a cabinet under the kitchen counter. By this testimony he expects the court to believe that the postal inspectors pulled the boxes and stacks of paper out of the kitchen cabinet and just happened to place them in the very location by the couch where Mr. Giwa admits he had placed them on an earlier occasion. The court finds this testimony, coming as it does from a convicted identity thief who told his lady friend he was a soccer player, inherently implausible.

In contrast, the court found the testimony of Inspector Lenard to be credible. Mr. Giwa asserts that her credibility was undermined by her apparently inaccurate testimony that the cabinet under the kitchen counter was only six inches deep and was therefore too small to accommodate the boxes and papers that were on the floor next to the couch. Attached as Exhibit A to Mr. Giwa's Second Supplemental Memorandum of Points and Authorities in Support of Defendant's Motion to Suppress Evidence (#260) is an affidavit of Mr. Giwa's CJA appointed investigator, James Conklin, dated September 21, 2006. Mr. Conklin states that on September 7, 2006, he inspected Apt. 309 at 600 S. Curson Avenue in Los Angeles, where he took photographs of and measured the kitchen cabinet in question. Attached as Exhibit C to the Second Supplemental Memorandum (#260) is the diagram Mr. Conklin drew of the cabinet.

1  It reflects that the cabinet is 17 inches deep, and has two shelf spaces, one atop the other, each
2  16 inches in height. The width of the shelf spaces is not indicated, but the photographs taken
3  by Mr. Conklin suggest that the width is approximately a foot and a half. *See* Exhibit B to Mr.
4  Giwa's Notice of Filing Errata (#263).
5  Accepting Mr. Conklin's affidavit as true, it appears that Inspector Lenard's recollection
6  of the depth of the cabinet is inaccurate. The question, however, is whether the inaccuracy is
7  the result of a memory failure, or the product of willful or reckless misstatement. The question
8  in turn becomes whether the boxes and papers depicted in the photograph marked as
9  government's Exhibit 2 in evidence, which depicts the boxes and papers as they were found in
10 Mr. Giwa's apartment on October 9, 2004, could reasonably be said to have fitted into the
11 kitchen cabinet at issue. A close look at Exhibit 2 reveals the presence of at least five boxes
12 large enough to house 8 ½ by 11 inch papers together with dozens of loose papers, large
13 envelopes, folders and spiral notebooks stacked on the floor. It is clear to the court that there
14 are many more materials on the floor than could fit in the cabinet in question. For that reason
15 the court finds that Inspector Lenard's inaccurate testimony about the dimensions of the kitchen
16 cabinet was innocent. Indeed, her recollection that the materials on the floor could not fit into
17 the cabinet is accurate. The court also finds that Mr. Giwa's testimony is unworthy of belief.
18 For that reason, the court finds that Mr. Giwa has failed to demonstrate that Inspector Lenard's
19 affidavit contains any false statements, let alone false statements made deliberately or
20 recklessly. Without demonstrating by a preponderance of the evidence that Inspector Lenard
21 made a false statement in her affidavit, and that the false statement was made deliberately or
22 with reckless disregard for the truth, Mr. Giwa *Franks* challenge to the affidavit must be
23 rejected. *Franks v. Delaware*, 438 U.S. at 155-156.
24 Even if paragraph 17 were not to be considered, the court finds that the affidavit would
25 contain probable cause to justify the issuance of the search warrants. The affidavit identified
26 Mr. Giwa as the leader of an identity theft ring that uses the personal information of victims to

obtain replacement credit cards in the victims' names from banks and credit card companies. Using false identification bearing the victims' names but his own picture, Mr. Giwa used the replacement cards to buy goods and services from a variety of retailers, including a $20,000 Rolex watch in September, 2003 from a jewelry store in Honolulu, two Rolex watches for $42,000 in November 2003 from a jewelry store in Phoenix, a $6,500 watch at a Mont Blanc store in Phoenix in February, 2004, and a $28,000 Patek Philippe platinum watch from another jewelry store in Phoenix in February, 2004. Mr. Giwa was identified as the purchaser in each instance based on a fraudulent drivers license bearing his photograph that was used in the transaction and photocopied by the sales clerk. Inspector Lenard's affidavit noted that Mr. Giwa had been arrested for the same type of identity theft scheme in 1999, at which time a search of his residence yielded numerous counterfeit credit cards and drivers licenses, hundreds of credit bureau reports, together with cash and merchandise. The affidavit noted that Mr. Giwa was convicted of identity theft in 2000 and sentenced to 41 months imprisonment and five years of supervised release. According to Lenard's affidavit, Mr. Giwa was deported to Nigeria on April 1, 2003. Yet, as noted above, just five months after he was deported, Mr. Giwa was identified as the person using a counterfeit credit card to purchase a $20,000 Rolex watch in Honolulu. Inspector Lenard's affidavit also disclosed that in early October, 2004 a confidential informant told her that in September, 2004 the informant rode with Mr. Giwa in a silver Range Rover to a business that provided internet service, where the informant downloaded for Mr. Giwa numerous credit reports onto three diskettes. This was only one month prior to issuance of the search warrants. The affidavit also described how Inspector Lenard learned that Mr. Giwa, using an assumed name, was residing in Apt. 309 at 600 South Curson Avenue in Los Angeles. Obviously, the inclusion of paragraph 17 in the affidavit only fortifies the probable cause showing.

* * *

To sum up, the arrest warrant based on a violation of supervised release was valid. The

14

deputy marshals' entry into Mr. Giwa's apartment on October 8, 2004 to arrest him on the warrant involved neither a search for nor a seizure of any evidence that advanced the postal inspectors' investigation. Assuming without deciding that the failure of the marshals and postal inspectors to knock and announce themselves before entering Mr. Giwa's apartment on October 9, 2004 constituted a violation of the knock-and-announce rule, the failure may no longer be remedied by the exclusionary rule. Inspector Lenard's affidavit in support of the search warrants did not contain false statements, let alone deliberate or reckless false statements. The affidavit contained abundant probable cause to support the issuance of the requested search warrants. The search for and seizure of incriminating evidence met the requirements of the Fourth Amendment.[4]

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned U.S. Magistrate Judge that Giwa's Motion to Suppress Evidence (#168) should be denied.

DATED this 29th day of May, 2007.

_____
**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**

---

[4] Mr. Giwa also complains that the nighttime execution of the arrest warrant violated Fed.R.Crim.P. 41(e), which requires that a warrant command the officer to execute the warrant during the daytime unless the issuing judge expressly authorizes execution at another time. The complaint is misplaced. Rule 41 deals with search warrants, not arrest warrants. It makes little sense to place such a limitation on the time of day when an arrest warrant may be executed.
   Mr. Giwa also alleges that the protective sweep conducted by the arresting agents on October 9, 2004 was "overly expansive." The allegation is not supported by the evidence.

15